## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CHARLES MARCUS LANGSTON, as
Administrator of the Estate of Zack Langston,
DANAE YOUNG, as mother and next friend
for D.L., a minor, and all others similarly
situated,

               *Plaintiffs*,

    *v.*

MID-AMERICA INTERCOLLEGIATE
ATHLETICS ASSOCIATION, a Missouri
nonprofit corporation, and NATIONAL
COLLEGIATE ATHLETIC ASSOCIATION,

               *Defendants.*

Case No.

**COMPLAINT – CLASS ACTION**

**DEMAND FOR JURY TRIAL**

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Charles Marcus Langston and Danae Young bring this Class Action Complaint and Demand for Jury Trial against Defendants Mid-America Intercollegiate Athletics Association ("Mid-America") and the National Collegiate Athletic Association ("NCAA") for the wrongful death of Zachary Langston, and to obtain redress for him and all other persons who were injured, incapacitated, or died as a result of Defendants' reckless disregard for the health and safety of generations of Pittsburg State University student-athletes. Plaintiffs allege as follows upon personal knowledge as to themselves and their own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by their attorneys.

### INTRODUCTION

1. By his twenty-sixth birthdate, Zack Langston had everything going for him. He was extremely well-liked, raised and surrounded by a loving family, had a beautiful two-year-old

son, had a great job, regularly attended church, had a devoted girlfriend, and was a star linebacker at Pittsburg State University.

2.      Everything was great, until it wasn't. Towards the end of his college career, Zack began to struggle with anxiety and became consumed with debilitating stress—often over minor issues. Over the course of a few months, Zack's behavior drastically deteriorated. He lost interest in socializing with friends, became extremely paranoid, began suffering from memory issues, and became suicidal. Zack attributed his decline to a brain "messed up" from the over one hundred concussions he suffered while playing football. Feeling hopeless, Zack began to plan the details of how he would end what ultimately became his tragically short life.

3.      On February 24, 2014, at age 26, Zack followed through with his plan by shooting himself in the chest, specifically so that his brain would be preserved to examine the damage caused by football.

4.      After his death, that examination revealed that Zack suffered from Stage II/IV Chronic Traumatic Encephalopathy ("CTE"). CTE is a dangerous progressive degenerative brain disease found in athletes and others with a history of repetitive brain trauma. As discussed in more detail below, repetitive brain trauma can cause a build-up of an abnormal type of protein called tau, which slowly kills brain cells.

5.      For decades, Defendant NCAA knew about the debilitating long-term dangers of concussions, concussion-related injuries, and sub-concussive injuries (referred to as "traumatic brain injuries" or "TBIs") that resulted from playing college football, but recklessly disregarded this information to protect the very profitable business of "amateur" college football.

6.      While in school, Pittsburg State football players were under Defendants' care. Unfortunately, Defendants did not care about the off-field consequences that would haunt their

2

students for the rest of their lives, ultimately causing Zack Langston and others to end their lives.

7.     Despite knowing for decades of a vast body of scientific research describing the danger of TBIs, Defendants failed to implement adequate procedures to protect Zack Langston and other Pittsburg State football players from the long-term dangers associated with them. They did so knowingly and for profit.

## PARTIES

8.     Plaintiff Charles Marcus Langston brings this action on behalf of the Estate of Zack Langston. Charles was appointed Administrator of the Estate of Zack Langston on April 11, 2017 by the District Court of Johnson County, Kansas, Probate Division. Charles is a citizen of the State of Kansas and Zack was domiciled in the State of Kansas when he died.

9.     Plaintiff Danae Young brings this action as mother and next friend for D.L., Zack Langston's minor son. Danae and D.L. are citizens of the State of Kansas.

10.     Defendant Mid-America Intercollegiate Athletics Association is a nonprofit corporation organized and existing under the laws of the State of Missouri, with its principal office located at 1627 Main Street, Suite 901, Kansas City, Missouri 64108. Defendant Mid-America conducts business throughout this District, the State of Kansas, and the United States.

11.     Defendant NCAA is an unincorporated association with its principal place of business located at 700 West Washington Street, Indianapolis, Indiana 46206. Defendant NCAA is not organized under the laws of any State, but is registered as a tax-exempt organization with the Internal Revenue Service. As such, Defendant NCAA is a citizen of the State of Indiana pursuant to 28 U.S.C. 1332(d)(10). Defendant NCAA conducts business throughout this District, the State of Kansas, and the United States.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this case under 28 U.S.C. §

1332(d)(2) because (a) at least one member of the Class, which consists of at least 100 members,

is a citizen of a state different from Defendants, (b) the amount in controversy exceeds

$5,000,000, exclusive of interest and costs, and (c) none of exceptions under that subsection

apply to this action.

13.     This Court has personal jurisdiction over Defendants because they conduct

significant business in this District, including establishing consumer and business contracts here

and because the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or

emanated in part from this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants

conduct significant business in this District such that they are subject to the Court's personal

jurisdiction and thus can be deemed to reside here.

## FACTUAL BACKGROUND

### I.     The NCAA and Mid-America Had a Duty to Protect Their Student-Athletes, including Zack Langston.

15.     Defendant NCAA is the governing body of collegiate athletics that oversees

twenty-three college sports and over 400,000 students who participate in intercollegiate athletics,

including in Mid-America and the football program at Pittsburg State. According to the NCAA,

"[m]ore than 1,200 schools, conferences and affiliate organizations collectively invest in

improving the experiences of student-athletes – on the field, in the classroom, and in life."[1]

16.     To accommodate the wide spectrum of student-athletes at its member schools, the

---

[1]     Membership, *National Collegiate Athletic Association*, http://www.ncaa.org/about/who-we-are/membership (last visited June 2, 17).

4

NCAA has three different divisions of intercollegiate competition.

17.     Each NCAA Division is composed of several "conferences" to facilitate regional league play. Defendant Mid-America is one such conference that was established in 1912 and currently consists of 14 member institutions located in the middle region of the United States. Mid-America promulgates rules, handbooks, and regulations for its member organizations in order to regulate its member institutions athletic departments. Each member institution, and each of the member institution's athletes, agree to abide by the rules and regulations issued by the NCAA and Mid-America.

18.     Pittsburg State joined Mid-America in 1989 and continues to participate in Mid-America athletics to this day.

19.     The Pittsburg State football program has a strong following that attracts thousands of visitors to its campus each game and generates millions of dollars for the school.

20.     Collectively, Defendants govern and regulate the Pittsburg State football program and at all times relevant owed a duty of care to safeguarding the well-being of their student-athletes.

21.     In fact, since its founding in 1906, the NCAA (then the Intercollegiate Athletic Association of the United States ("IAAUS")), has claimed to be "dedicated to safeguarding the well-being of student-athletes and equipping them with the skills to succeed on the playing field, in the classroom and throughout life."[2] The IAAUS was specifically formed for this purpose because, at the turn of the 20th Century, head injuries were occurring at an alarming rate in college football. In response, President Theodore Roosevelt convened a group of Ivy League university presidents and coaches to discuss how the game could be made safer. After several

---

[2]     About the NCAA, *National Collegiate Athletic Association*, http://www.ncaa.org/about (last visited June 2, 17).

5

subsequent meetings of colleges, the association was established.[3] As such, the genesis of the
NCAA was for a singular goal: student-athlete safety.

22.     According to the NCAA, "[c]ollege and university presidents and chancellors
guide each division, supported by an extensive committee structure guided by athletic
administrators, faculty and student-athlete representatives[, but that each] division creates its
own rules that follow the overarching principles of the NCAA."[4]

23.     The overarching principles of the NCAA, including its purported commitment to
safeguarding its student-athletes, are contained in the NCAA Constitution. The NCAA
Constitution clearly defines the NCAA's purpose and fundamental policies to include
maintaining control over and responsibility for intercollegiate sports and student-athletes. The
NCAA Constitution states in pertinent part:

> The purposes of this Association are:
>
> (a) To initiate, stimulate and improve intercollegiate athletics
>     programs for student-athletes;
>
> (b) To uphold the principal of *institutional control* of, and
>     responsibility for, all intercollegiate sports in conformity with
>     the constitution and bylaws of this association;

NCAA Const., Art. 1, § 1.2(a)(b) (emphasis added).

24.     The NCAA Constitution also defines one of its "Fundamental Policies" as the
requirement that "Member institutions shall be obligated to apply and enforce this legislation,
and the enforcement procedures of the Association shall be applied to an institution when it fails
to fulfill this obligation." NCAA Const., Art. 1, § 1.3.2.

25.     Article 2.2 of the NCAA Constitution specifically governs the "Principle of

---

3       In 1910, the IAAUS changed its name to the National Collegiate Athletic Association.

4       Membership, *National Collegiate Athletic Association*, http://www.ncaa.org/about/who-
we-are/membership (last visited June 2, 17).

Student-Athlete Well-Being," and provides:

> **2.2 The Principle of Student-Athlete Well-Being.**
>
> Intercollegiate athletics programs shall be conducted in a manner designed to protect and enhance the physical and educational well-being of student athletes. (Revised: 11/21/05.)
>
> **2.2.3 Health and Safety.**
>
> It is the responsibility of each member institution to protect the health of, and provide a safe environment for, each of its participating student athletes. (Adopted: 1/10/95.)

26.     To accomplish this purpose, NCAA promulgates and implements standard sport regulations and requirements, such as the NCAA Constitution, Operating Bylaws, and Administrative Bylaws. These NCAA documents provide detailed instructions on game and practice rules, player eligibility, scholarships, and player well-being and safety. NCAA member institutions, including athletic conferences like Mid-America, are required to abide by the NCAA rules and requirements. Specifically, according to the NCAA Constitution: "Each institution shall comply with all applicable rules and regulations of the Association in the conduct of its intercollegiate athletics programs . . . Members of an institution's staff, student-athletes, and other individuals and groups representing the institution's athletics interests shall comply with the applicable Association rules, and the member institution shall be responsible for such compliance." NCAA Const., Art. 2, § 2.8.1.

27.     The NCAA publishes a health and safety guide termed the Sports Medicine Handbook (the "Handbook"). The Handbook, which is produced annually, includes the NCAA's official policies and guidelines for the treatment and prevention of sports-related injuries, as well as return-to-play guidelines, and recognizes that "student-athletes rightfully assume that those who sponsor intercollegiate athletics have taken reasonable precautions to minimize the risk of

injury from athletics participation."[5]

28.     To provide member institutions with the tools that they need to comply with
NCAA legislation, the NCAA Constitution promises that the "Association shall assist the
institution in its efforts to achieve full compliance with all rules and regulations. . . ." NCAA
Const., Art. 2, § 2.8.2.

29.     Likewise, according to the NCAA Constitution, a member conference is entitled
to all of the privileges of active members, except the right to compete in NCAA championships.
*See* NCAA Const., Art. 3, § 3.02.3.2. Member "conferences of [the NCAA] agree to administer
their athletics programs in accordance with the constitution, bylaws and other legislation of the
Association." NCAA Const., Art. 3, § 3.3.4.1.

30.     The NCAA, therefore, holds itself out as both a proponent of and authority on the
treatment and prevention of sports-related injuries upon which the student-athletes, Mid-
America, and Pittsburg State (*i.e.*, a member institution) can rely upon for guidance on player-
safety issues.

31.     As a member conference of the NCAA, Mid-America was charged with
implementing and enforcing those guidelines in a meaningful way to protect the health and
safety of Pittsburg State football players, including Zack Langston.

32.     As a member conference of the NCAA, Mid-America was obligated to help
protect the health and safety of their student-athletes and agreed to abide by the NCAA
Constitution.

33.     Zack Langston relied upon the Defendants authority and guidance to protect his

---

[5]     *See*, *e.g.*, David Klossner, *2013-14 NCAA Sports Medicine Handbook*, NATIONAL
COLLEGIATE ATHLETIC ASSOCIATION (Aug. 2013), *available at*
https://www.ncaa.org/sites/default/files/2013-14%20Sports%20Medicine%20Handbook.pdf.

health and safety by treating and preventing him from head related injuries, including the effects of those head injuries later on in his life.

34.     As compared to Zack and other Pittsburg State football players, the NCAA and Mid-America were in a superior position to know of and mitigate the risks of him sustaining concussions and other TBIs while playing football at Pittsburg State.

## II.   Decades of Studies Firmly Establish the Dangers Associated with Football-Related Concussions.

35.     Throughout the twentieth century and into the twenty-first century, studies have firmly established that repetitive and violent impacts to the head can cause concussions with a heightened risk of long term traumatic brain injuries (or TBI), including memory loss, dementia, depression, CTE, Alzheimer's disease, Parkinson's disease, and other related symptoms. To better understand the results of these studies, a brief introduction to concussions in football follows.

### A.     An Overview of Concussions in Football.

36.     A concussion is a traumatic brain injury caused by an impact that causes the head and brain to move rapidly back and forth. The movement causes the brain to bounce around or twist in the skull, damaging brain cells and creating chemical changes in the brain.

37.     The human brain is made of soft tissue, cushioned by spinal fluid, and encased in a hard skull. During everyday activity, the spinal fluid protects the brain from crashing against the skull. But relatively minor impacts—including not only direct blows to the head but also blows to the body and movements that cause the neck to whiplash—can move the brain enough to press through the spinal fluid, knock against the inside of the skull, and cause concussions.

38.     Concussions typically occur when linear and rotational accelerations impact the brain through either direct impacts to the head or indirect impacts that whiplash the head. During

the course of a college football season, studies have shown athletes can receive more than 1,000 impacts greater than 10g (or gravitational) force. This is slightly more force than a fighter pilot receives doing maximal maneuvers. The majority of football-related hits to the head exceed 20g's.

39.     Kevin Guskiewicz, of the University of North Carolina's Sports Concussion Research Program, compared the impacts sustained in a routine college football practice to crashing a car: "If you drove your car into a wall at twenty-five miles per hour and you weren't wearing your seat belt, the force of your head hitting the windshield would be around 100[g']s: in effect, the player [who sustained two hits above 80g's,] had two car accidents that morning."[6]

    i.     Concussion Symptoms.

40.     When a student-athlete suffers a severe impact to the head, they may start experiencing concussion-related symptoms, including:

- "seeing stars" and feeling dazed, dizzy, or lightheaded;

- memory loss, such as trouble remembering things that happened right before and after the injury;

- nausea or vomiting;

- headaches;

- blurred vision and sensitivity to light;

- slurred speech or saying things that do not make sense;

- difficulty concentrating, thinking, or making decisions;

- difficulty with coordination or balance (such as being unable to catch a ball or other easy tasks);

- feeling anxious or irritable for no apparent reason; or

---

[6]     Malcolm Gladwell, Offensive Play, *The New Yorker* (October 19, 2009) http://www.newyorker.com/magazine/2009/10/19/offensive-play.

- feeling overly tired.

41.     A student-athlete may not recognize the signs or symptoms of a concussion, and, more often, the effect of the concussion itself prevents him from recognizing them. Because of that, he may put himself at risk of further injury by returning to a game after a concussion. Brains that have not had time to properly heal from a concussion are particularly susceptible to further injury.

ii.     Post-Concussion Treatment.

42.     After a concussion, the brain needs time to heal. Doctors generally prohibit individuals from returning to normal activities—certainly including contact sports—until all symptoms have subsided. They do so because, immediately after a concussion, the brain is particularly vulnerable to further injury.

43.     The length of the healing process varies from person to person and from concussion to concussion. Symptoms may even last for one or two weeks.

44.     Individuals who do not recover from a concussion within a few weeks are diagnosed with post-concussion syndrome. The symptoms of post-concussion syndrome can last for months or sometimes even be permanent. Generally, people suffering from post-concussion syndrome are referred to specialists for additional medical help.

45.     Many people think of concussions as short-term, temporary injuries. But scientific research demonstrates that the effects of concussions anything but temporary.

B.     _Studies Confirm the Dangers and Long-Term Effects of Concussions_.

46.     The two leading studies of the long-term effects of concussions were conducted by Boston University's Center for the Study of Traumatic Encephalopathy and the Brain Injury Research Institute. These studies showed the "devastating consequences" of repeated

11

concussions, including that they lead to an increased risk of depression, dementia, and suicide. These studies have also demonstrated that repeated concussions trigger progressive degeneration of the brain tissue, including the build-up of an abnormal protein called tau.

47.    Between 2002 and 2007, Dr. Omalu, of the Brain Injury Research Institute, examined the brains of five former NFL players: Andre Waters, Mike Webster, Terry Long, Justin Strzelcyyk, and Damien Nash. Waters killed himself, Nash died unexpectedly at the age of 24, Webster—homeless and cognitively impaired—died of heart failure, and Strzelcyyk died driving the wrong way down a highway at 90 miles per hour. Four of the five brains showed the telltale characteristics of CTE, which is a progressive degenerative disease of the brain found in people with a history of repetitive brain trauma.

48.    Dr. Cantu, of the Boston University Center for the Study of Traumatic Encephalopathy, has found evidence of CTE in 90 of 94 (96%) autopsied brains of former NFL players. He has found CTE in 79% of all autopsied brains of former football players (who played at *any* level).

49.    Dr. Omalu now believes that more than 90% of former NFL players suffer from CTE.

50.    Unfortunately, studies like Drs. Cantu's and Omalu's—which establish the devastating dangers related to TBIs—date back to the early twentieth century. Beginning with studies on the brain injuries suffered by boxers in the 1920s, medical science has long recognized the debilitating effects of concussions and other TBI, and found that that repetitive head impacts can cause permanent brain damage and increased risk of long-term cognitive decline and disability.

51.    For instance, in 1928, pathologist Dr. Harrison Martland published a study called

"Punch Drunk" in the *Journal of the American Medical Association*, where he described the clinical spectrum of abnormalities found in nearly 50 percent of boxers who had been knocked out or who had suffered a considerable impact to the head. *See* Dr. Harrison S. Martland, *Punch Drunk*, 91 JAMA 1103 (1928).

52.     Countless studies were later conducted on boxers suffering chronic neurological damage as a result of repeated head injuries and who were displaying signs of dementia and impairment of motor function. As incidents of chronic encephalopathy increased, they were often characterized as a "Parkinsonian" pattern of progressive decline.

53.     Nearly a decade after Dr. Martland's study, the American Football Coaches Association first published a report warning that players who suffer concussions should be removed from play. Then nearly twenty years after that, in 1952, an article published in *The New England Journal of Medicine* first recommended a three-strike rule for concussions in football, that recommended that players cease to play football permanently after receiving their third concussion.

54.     Starting in the late 1960's, the medical community began focusing on the effects of concussion-related injuries in football. In a 1967 study, Drs. Hughes and Hendrix examined how severe impacts affected brain activity in football players by utilizing electroencephalograms (commonly known as "EEGs"). Shortly after that, a potentially fatal condition known as "Second Impact Syndrome" was identified, which is a re-injury to an already-concussed brain that triggers swelling that the skull cannot accommodate.

55.     Study after study published in medical journals including the *Journal of the American Medical Association*, *Neurology*, *The New England Journal of Medicine*, and *Lancet* warned of the dangers of single concussions, multiple concussions, and/or football-related head

trauma from multiple concussions. These studies collectively established that:

- repetitive head trauma in contact sports, including football, has potential dangerous long-term effects on brain function;

- encephalopathy (dementia pugilistica) is caused by repeated sub-concussive and concussive blows to the head;

- acceleration and rapid deceleration of the head that results in brief loss of consciousness also results in a tearing of the axons (brain cells) brainstem;

- with respect to head injury in athletes who play contact sports, there is a relationship between neurologic pathology and length of the athlete's career;

- immediate retrograde memory issues occur following concussions;

- head injury requires recovery time without risk of subjection to further injury;

- a football player who suffers a concussion requires significant rest before being subjected to further contact; and,

- minor head trauma can lead to neuropathological and neurophysiological alterations, including neuronal damage, reduced cerebral blood flow, altered brainstem evoked potentials and reduced speed of information processing.

56.     As a result of these, and countless other studies, medical professionals began recommending changes to the game of football and how concussion-related injuries should be handled.

57.     By 1991, Dr. Cantu, the American Academy of Neurology, and Colorado Medical Society developed return-to-play criteria for football players suspected of sustained head injuries.

58.     In 2003, an NCAA concussion study concluded that football players who had previously sustained a concussion were more likely to have future concussion injuries. Another 2003 NCAA concussion study concluded that collegiate football players "may require several

14

days for recovery of symptoms, cognitive dysfunction, and postural instability after [a] concussion," and that concussions are "followed by a complex cascade of ionic, metabolic, and physiological events that can adversely affect cerebral function for several days to weeks."[7]

59.     Following these studies, a National Athletic Trainers' Association position statement in 2004 recommended baseline cognitive and postural-stability testing, as well as return-to-play recommendations including holding out athletes who exhibit symptoms of a suspected head injury.

60.     Building upon that, a convention of neurological experts met in Prague in 2004 with the aim of providing recommendations for the improvement of safety and health of athletes who suffer concussive injuries in ice hockey, rugby, football, and other sports based on the most up-to-date research. These experts recommended that a player never be returned to play symptomatic, and coined the phrase, "when in doubt, sit them out."

61.     Ultimately, while Defendants knew of the harmful effects of TBI on student-athletes for decades, it ignored these facts and failed to institute any meaningful methods of warning and/or protecting the student-athletes, including the football players. For Defendants, the continued expansion and operation of college football was simply too profitable to put at risk.

## III.    Defendants Breached Their Duty to Their Student-Athletes by Ignoring the Dangers of Concussions and Failing to Implement Reasonable Concussion Management Protocols.

62.     For decades, Defendants have been aware that severe head impacts can lead to long-term brain injury, including memory loss, dementia, depression, and CTE. Unfortunately, while Defendants knew about the harmful and devastating effects of these sub-concussive and

---

[7]     Michael McCrea, *et al.*, Acute Effects and Recovery Time Following Concussion in Collegiate Football Players, The NCAA Concussion Study, *The Journal of the American Medical Association* (November 19, 2003), *available at* http://jama.jamanetwork.com/article.aspx?articleid=197668.

concussive injuries, they recklessly ignored these facts and failed to implement reasonable concussion management protocols to protect their student-athletes.

63.     In fact, on information and belief, during every decade referenced above, Defendant NCAA was advised by physicians and researchers of the severe risks associated with playing football, including the risks associated with TBI.

64.     Since at least 1933, the NCAA has known of the serious nature of concussions and recognized the need for appropriate concussion management protocols. In its 1933 Medical Handbook, NCAA specifically recognized that head injuries warrant special attention and should not be regarded lightly. The Handbook then provided information for school and college doctors, coaches, and trainers to identify the signs and symptoms of concussions, as well as methods to be used on the sidelines for treating them.

65.     Rather than inform Zack Langston of these risks or implement protocols to protect and safeguard him from TBI-related injuries (as the NCAA and Mid-America promised to do through the NCAA Constitution, among other things), Defendants failed to meaningfully adopt or enforce the internationally accepted guidelines regarding concussion management and return to play protocols until 2010.

66.     Instead, and in complete disregard of the vast body of known scientific evidence and the resources and authority possessed by Defendants, up until 2010, Defendants failed to:

- implement adequate guidelines or rules to prevent repeated concussions and failed to educate players, including Zack Langston, about the increased risk of concussive and sub-concussive injury in football, particularly under circumstances when the helmet is used as a weapon when tackling, blocking, or running with the football;

- recommend or enforce return to play procedures or take adequate action to educate student-athletes, including Zack Langston, about the risks of repetitive head injuries;

16

- conduct a football program that proactively encouraged Zack Langston and other Pittsburg State football players to avoid head injuries, instead compelling Zack Langston to ignore concussion symptoms and continue to play football within moments of experiencing concussion symptoms. For instance, Pittsburg State coaches demanded that Pittsburg State football players, including Zack Langston, forego their own self-interest and continue playing despite sustaining head injuries for the purpose of advancing the Pittsburg State football program by winning games, obtaining fame and favorable publicity, and gaining millions of dollars in revenue for Pittsburg State, Mid-America, and the NCAA; and

- contact football players after they left Pittsburg State to inform them that they had been exposed to an increased risk of long-term brain damage by the sub-concussive and concussive blows sustained while playing football for Pittsburg State.

67.     It was also not until April 2010, under mounting public pressure, that the NCAA made changes to its concussion treatment protocols, this time enacting a new policy that required its member institutions to have a Concussion Management Plan ("CMP") in place for all sports.

68.     Under that new policy, schools were required to have a CMP on file "such that a student-athlete who exhibits signs, symptoms, or behaviors consistent with a concussion shall be removed from practice or competition and evaluated by an athletics healthcare provider with experience in the evaluation and management of concussions."

69.     The policy further states that students diagnosed with a concussion "shall not return to activity for the remainder of that day" and the team physician would determine that medical clearance.

70.     Finally, the policy required students to sign a statement "in which they accept the responsibility for reporting their injuries and illnesses, including signs and symptoms of concussion" to medical staff and noted that students would be provided educational materials on concussions during the signing process.

71.     This policy is also flawed: due to the very nature of concussions, student-athletes

suffering concussive injuries are in no position to police themselves or to give informed consent about whether to continue playing. For example, the types of questions used to screen players for concussions include "What's your name?", "What year is it?", and "What sport are we playing?". These types of questions are used for screening precisely because players experiencing concussions routinely fail to answer them correctly, despite their very elementary nature. Following logically on that, a player who cannot state his or her own name is in no condition to make an informed decision about whether or not to continue playing, and is entirely dependent on others, such as the NCAA, Mid-America, and Pittsburg State to identify concussive injuries in real-time and take appropriate remedial actions. While Zack Langston played football at Pittsburg State, the Defendants stood in the role of guardians tasked with making decisions in his best interest. Defendants failed to fulfill that role and instead acted in their own self-interest, all to Zack's detriment, which ultimately led to his death.

72.     In the end, these (still deficient) policies were implemented far too late for the Defendants' student-athletes, including Zack Langston.

## FACTS SPECIFIC TO ZACK LANGSTON

73.     Zack Langston played football at Pittsburg State from 2007 to 2010 as an outside linebacker.

74.     While playing football at Pittsburg State, Zack suffered from over one hundred concussions. In one instance, during his freshman year, Zack's coaches would call for "hamburger drills", where Zack and his teammates would form a circle and get called out two at a time, to run out and hit each other as hard as they could. Zack suffered repeated concussive and sub-concussive hits during drills and practices like these.

75.     Unfortunately, Pittsburg State failed to provide appropriate medical treatment during these incidents. In fact, Zack Langston was often told to just "shake it off" and get back in the game or practice, if he was even attended to at all.

76.     Since the inception of Pittsburg State's football program, through at least 2010, there were no adequate concussion management protocols or policies in place to address and treat concussions sustained by Zack Langston during practices and in games.

77.     In fact, although Zack Langston sustained repetitive concussive and sub-concussive hits in practices and games for their profit and promotion, the NCAA and Mid-America failed to adopt or implement adequate concussion management safety protocols or return to play guidelines during his time on Pittsburg State's football team.

78.     Accordingly, every time Zack Langston suffered a concussive or sub-concussive hit, he would quickly be returned to the field of play.

79.     Likewise, each time Zack Langston suffered a concussive or sub-concussive hit, he was deprived by the NCAA and Mid-America of the appropriate medical attention and treatment that they knew was necessary to monitor, manage, and mitigate risks associated with TBIs.

80.     As a result, towards the end of his college career Zack began struggling with severe anxiety, stress, mood swings and anger, memory problems, and depression. Despite his persistence to get better, Zack's behavior worsened.

81.     Convinced that football had "messed up his brain" and caused his suffering, Zack ultimately decided to shoot himself in the chest to end his suffering. He specifically planned to shoot himself in the chest in order to preserve his brain so that it could be evaluated to determine the damage that might have been caused by football.

19

82.     On February 24, 2014, at age 26, Zack followed through with his plan and fatally

shot himself in the chest.

83.     After his death, Zack's brain was sent to the Boston University School of

Medicine, Chronic Traumatic Encephalopathy Center to be examined. That postmortem

examination from June 2015 revealed that Zack suffered from Stage II/IV CTE.

## CLASS ACTION ALLEGATIONS

84.     **Class Definitions**: Plaintiff Charles Marcus Langston brings this action on behalf

of the Estate of Zack Langston and a class and subclass (collectively the "Student-Athlete

Class", unless otherwise indicated) defined as follows:

> **Student-Athlete Class**: All individuals who participated in Pittsburg State
> University's varsity football program between 1952 and 2010, or their authorized
> representatives, ordered by a court or other official of competent jurisdiction
> under applicable state law.

> **Student-Athlete Subclass**: All individuals who participated in Pittsburg State
> University's varsity football program between 1989 and 2010, or their authorized
> representatives, ordered by a court or other official of competent jurisdiction
> under applicable state law.

Plaintiff Danae Young brings this action on behalf of D.L., a minor, and a class and

subclass (collectively the "Derivative Class", unless otherwise indicated) defined follows:

> **Derivative Class**: Spouses, parents, children who are dependents, or any other
> persons who properly under applicable state law assert the right to sue
> independently or derivatively by reason of their relationship with individuals who
> participated in Pittsburg State University's football program between 1952 and
> 2010.

> **Derivative Subclass**: Spouses, parents, children who are dependents, or any other
> persons who properly under applicable state law assert the right to sue
> independently or derivatively by reason of their relationship with individuals who
> participated in Pittsburg State University's football program between 1989 and
> 2010.

The following people are excluded from the Student-Athlete Class and Derivative Class

(collectively the "Classes", unless otherwise indicated): (1) any Judge or Magistrate presiding

over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents,

successors, predecessors, and any entity in which the Defendants or their parents have a

controlling interest and their current or former employees, officers and directors; (3) persons who

properly execute and file a timely request for exclusion from the Classes; (4) persons whose

claims in this matter have been finally adjudicated on the merits or otherwise released; (5)

Plaintiffs' counsel and Defendants' counsel; and (6) the legal representatives, successors, and

assigns of any such excluded persons.

85.     **Numerosity**: The exact number of the members of the Classes is unknown and

not available to Plaintiffs at this time, but it is clear that individual joinder is impracticable. On

information and belief, hundreds of individuals fall into the definitions of the Classes.

86.     **Commonality**: There are many questions of law and fact common to the claims

of Plaintiffs and the Classes, and those questions predominate over any questions that may affect

individual members. Common questions for the Classes include, but are not limited to the

following:

> (a)     Whether Defendants had a duty to adequately warn and
> educate players about the dangers and symptoms of
> concussions and concussion-related brain injuries;

> (b)     Whether Defendants had a duty to enact rules and
> procedures to protect players from sustaining concussions
> and concussion-related traumatic brain injuries;

> (c)     Whether Defendants' conduct as alleged herein constitutes
> a breach of duty;

> (d)     Whether Defendants' conduct as alleged herein constitutes
> negligence;

> (e)     Whether Defendants' conduct as alleged herein constitutes
> breach of contract;

21

(f)     Whether Defendants were unjustly enriched at the expense of Plaintiff Langston and the Student-Athlete Class; and

(g)     Whether Plaintiffs and the Classes are entitled to relief, including actual and compensatory damages, and injunctive or other equitable relief.

87.     **Typicality**: Plaintiffs' claims are typical of the claims of other members of their respective Classes, as Plaintiffs and other members sustained injuries arising out of the wrongful conduct of Defendants based upon the same unlawful conduct.

88.     **Adequate Representation**: Plaintiffs will fairly and adequately protect the interests of the Classes and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.

89.     **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Classes as Against Defendants)

90.     Plaintiffs incorporate by reference the foregoing allegations.

91.     From its inception and by virtue of its role as the governing body in college

athletics, the NCAA has historically assumed a duty to protect the health and safety of all student-athletes at member institutions, including Zack Langston. The NCAA also assumed a duty of care by voluntarily taking steps to protect and promote the health and safety of its players, including promulgating safety handbooks and regulations. That duty included an obligation to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes. Defendant Mid-America shared this same duty to supervise, regulate, and monitor the rules of its governed sports, and provide appropriate and up-to-date guidance and regulations to minimize the risk of injury to its student-athletes.

92.     The duties of both Defendants included an obligation to supervise, regulate, and monitor the rules of the Pittsburg State football program and provide appropriate and up-to-date guidance and regulations to minimize the risk of long-term and short-term brain damage to Pittsburg State football players, including Zack Langston.

93.     Defendants had a duty to educate Pittsburg State and Pittsburg State football players on the proper ways to evaluate and treat TBI during football games and practices, including repetitive sub-concussive and concussive injury. Defendants' duties further included a duty to warn student-athletes of the dangers of sub-concussive and concussive injuries and of the risks associated with football before, during, and after they played college football and as additional information came to light.

94.     Defendants had a duty not to conceal material information from Pittsburg State football players, including Zack Langston.

95.     Defendants breached their duties owed to Pittsburg State football players, including Zack Langston, by failing to implement, promulgate, or require appropriate and up-to-

date guidelines regarding the evaluation and treatment of TBIs on the playing field, in the locker room, and in the weeks and months after they sustained TBIs, as well as providing treatment for the latent effects of TBIs. These failings included, but are not limited to:

(a)     failing to recognize and monitor concussive and sub-concussive injury during football practices and games;

(b)     failing to inform student football players of the dangers of concussive and sub-concussive injuries;

(c)     failing to implement return to play regulations for student football players who sustained concussive and/or sub-concussive injuries and/or were suspected of sustaining such injuries;

(d)     failing to implement procedures to monitor the health of student football players after they sustained (or were suspected of sustaining) concussive and/or sub-concussive injuries;

(e)     failing to inform the families of student football players who sustained concussive and/or sub-concussive injuries; and

(f)     failing to provide adequate notification, warning and treatment for latent neuro-cognitive and neuro-behavioral effects of concussive and sub-concussive injuries, after the time student football players left Pittsburg State.

96.     Defendants breached their duties to student football players, including Zack Langston, by failing to disclose and/or failing to recognize and/or being willfully non-observant of: (a) material information regarding the long-term risks and effects of repetitive head trauma they possessed or should have possessed; (b) the dangers of concussive and sub-concussive injuries; and (c) the proper ways to evaluate, treat, and avoid concussive and sub-concussive trauma to football players, including Zack Langston, at Pittsburg State.

97.     Pittsburg State football players, including Zack Langston, relied upon the guidance, expertise, and instruction of Defendants in understanding risks associated with the

serious and life-altering concussive and sub-concussive hits in football.

98.     At all times, Defendants had superior knowledge of material information regarding the effect of repeated traumatic head injuries. Because such information was not readily available to Pittsburg State football players, including Zack Langston, Defendants knew or should have known that they would act and rely upon the guidance, expertise, and instruction of Defendants on these crucial medical issues while attending Pittsburg State and thereafter.

99.     Repetitive TBIs during college football practices and games have a pathological and latent effect on the brain. Repetitive exposure to rapid accelerations to the head causes deformation, twisting, shearing, and stretching of neuronal cells such that multiple forms of damage take place, including the release of small amounts of chemicals within the brain, such as protein, which is a signature pathology of the same phenomenon as boxer's encephalopathy (or "punch drunk syndrome") studied and reported by Harrison Martland in 1928.

100.    Many Pittsburg State football players, including Zack Langston, experienced repetitive sub-concussive and concussive impacts during their college football careers, which significantly increased their risk of developing neurodegenerative disorders and diseases, including but not limited to CTE, Alzheimer's disease, and other similar cognitive-impairing conditions.

101.    The repetitive head accelerations and hits to which Pittsburg State football players, including Zack Langston, were exposed presented risks of latent and long-term debilitating chronic illnesses. Absent Defendants' negligence and concealment, the risk of harm to Pittsburg State football players, including Zack Langston, would have been materially decreased, and Zack Langston, for example, would not have sustained debilitating mental health issues, including the neurodegenerative disorder CTE.

102.    The repetitive head impacts and TBIs Pittsburg State football players, including Zack Langston, sustained while playing football at Pittsburg State resulted in neuro-cognitive and neuro-behavioral changes in them, including neuro-cognitive disability, decline, forgetfulness, and depression. In fact, a postmortem examination of Zack Langston's brain revealed that he suffered from Stage II/IV CTE.

103.    As a direct and proximate result of Defendants' negligence, which resulted in the death of Zack Langston and other Pittsburg State football players, D.L., as the sole surviving child of Zack Langston, and the other members of the Derivative Class have lost paternal care, financial support, training, advice, comfort, and protection, among other pecuniary and non-pecuniary losses. As a result, Defendants are liable to Plaintiff Danae Young, as representative of D.L., and the Derivative Class members for the full measure of damages allowed under Kan. Stat. Ann. § 60-1904.

104.    Additionally, Zack Langston and the Student-Athlete Class have incurred damages in the form of permanent brain damage, emotional distress, past and future medical costs, health care, home care expenses, other out of pocket expenses, lost time, lost future earnings, and other damages, including death. The Student-Athlete Class will likely incur future damages and injury as a result of Defendants' negligence.

105.    As a result of their negligence, Defendants are liable to Plaintiff Langston and the Student-Athlete Class for the full measure of damages and other relief allowed under applicable law, including under Kan. Stat. Ann. § 60-1801.

## SECOND CAUSE OF ACTION
## BREACH OF EXPRESS CONTRACT

**(On Behalf of Plaintiff Langston and the Student-Athlete Class as Against Defendants)**

106. Plaintiff Langston incorporates by reference the foregoing allegations.

107. As a football player at Pittsburg State, an institution governed by the NCAA,

Zack Langston and other Pittsburg State football players were required to, and did, enter into a

contract with the NCAA as a prerequisite to sports participation. The contract required Zack

Langston and other Pittsburg State football players to complete a form affirming that they had

read the NCAA regulations and applicable NCAA Division manual, which expressly

encompassed the NCAA Constitution, Operating Bylaws, and Administrative Bylaws, and

further, that they agreed to abide by NCAA Division bylaws.

108. In exchange for Zack Langston's and other Pittsburg State football players'

agreements, the NCAA promised to perform certain services and functions, including, among

other things:

> (a) conducting intercollegiate athletics in a manner designed to protect and enhance the physical and educational wellbeing of student-athletes;
>
> (b) requiring that each member institution protect the health of, and provide a safe environment for, each of its participating student-athletes; and
>
> (c) requiring that each member institution must establish and maintain an environment in which a student-athlete's activities, are conducted as an integral part of the student-athlete's educational experience.

109. By signing and agreeing to abide by NCAA regulations, and thereafter

participating in NCAA sanctioned sports programs in accordance with such regulations, Zack

Langston and other Pittsburg State football players fulfilled their contractual obligations to the

NCAA.

110. As described in the foregoing allegations, the NCAA breached the Parties'

agreements by failing to ensure that Zack Langston and other Pittsburg State football players were provided with a safe environment in which to participate in NCAA sport activities. The NCAA further breached the contract by concealing and/or failing to properly educate and warn Zack Langston and other Pittsburg State football players about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

111.    Zack Langston and other Pittsburg State football players entered into a written agreement with the NCAA in which they committed to play football at Pittsburg State, to attend Pittsburg State as a student, and to comply with all codes of conduct and obligations as both football players and students at Pittsburg State.

112.    Zack Langston and other Pittsburg State football players fulfilled their obligations under the contracts.

113.    The NCAA's contractual breaches caused Zack Langston and the Student-Athlete Class to suffer physical injury and damages in the form of, *inter alia*, past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages, including death.

114.    As a result of their misconduct, Defendants are liable to Plaintiff Langston and the Student-Athlete Class for the full measure of damages and other relief allowed under applicable law, including under Kan. Stat. Ann. § 60-1801.

## THIRD CAUSE OF ACTION
## BREACH OF IMPLIED CONTRACT
### (On Behalf of Plaintiff Langston and the Student-Athlete Class as Against Defendants)

115.    Plaintiff Langston incorporates by reference the foregoing allegations.

116.    To the extent that an express written contract cannot be established between Defendants and Zack Langston, and Defendants and other Pittsburg State football players, the facts set forth above support the finding of an implied contract.

117.    Under the implied contract, student-athletes, including Zack Langston, agreed to be bound by NCAA and Mid-America rules and regulations in exchange for their participation in NCAA and Mid-America controlled athletic programs, including the Pittsburg State football program. As a condition of the implied contract, the NCAA agreed to abide by, and Mid-America agreed to implement, the promises set forth in its own Constitution and Bylaws, as described above.

118.    Zack Langston and other Pittsburg State football players indicated their acceptance of the contract, and further, fully performed under the contract, by participating in the Pittsburg State football program in accordance with NCAA and Mid-America rules and regulations.

119.    Defendants breached their implied contractual duties by failing to ensure that Zack Langston and other Pittsburg State football players were provided with a safe environment in which to participate in football activities. Defendants further breached their contracts by concealing and/or failing to properly educate and warn players, including Zack Langston, about the symptoms and long-term risks of concussions and concussion-related traumatic injury.

120.    Defendants' breaches caused Zack Langston and the Student-Athlete Class to suffer physical injury and damages in the form of, *inter alia*, past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages, including death. Further, the Student-Athlete Class will likely incur future damages caused by Defendants' breaches.

121.    As a result of their misconduct, Defendants are liable to Plaintiff Langston and the

Student-Athlete Class for the full measure of damages and other relief allowed under applicable

law, including under Kan. Stat. Ann. § 60-1801.

## FOURTH CAUSE OF ACTION
## BREACH OF EXPRESS CONTRACT
### (On Behalf of Plaintiff Langston and the Student-Athlete Class as
### Third-Party Beneficiaries as Against Defendant NCAA)

122.    Plaintiff Langston incorporates by reference the foregoing allegations.

123.    To the extent that no express or implied contract is found to exist between Zack

Langston and Defendants, or Defendants and other Pittsburg State football players, an express

contract existed between the NCAA and Pittsburg State.

124.    Under the terms of that contract, Pittsburg State agreed to abide by the applicable

NCAA rules and regulations, including those expressly set forth in the NCAA's Division

Manuals, Constitution, and Bylaws.

125.    Under the terms of that contract, as set forth in the NCAA Constitution and

encompassed within the NCAA Division Manuals, Pittsburg State and NCAA agreed to, among

other things: (1) conduct intercollegiate athletic programs in a manner designed to protect and

enhance the physical and educational well-being of student athletes, including Zack Langston;

and (2) protect the health of and provide a safe environment for each of its participating student-

athletes, including Zack Langston.

126.    Zack Langston and other Pittsburg State football players were intended third-party

beneficiaries of the contract between the NCAA and Pittsburg State. Such an intention can be

found in the express language of the NCAA's rules and regulations, as well as the stated purpose

and principles of the NCAA organization.

127.    The NCAA breached the contractual duties owed to Zack Langston and other Pittsburg State football players under those contracts by: (1) failing to implement or require rules of play and return to play criteria to minimize or prevent the risk of concussions and concussion-related injuries to them; and (2) failing to adequately inform and educate them on the symptoms and long-term dangers of concussions and concussion-related injuries.

128.    Defendant NCAA's breach caused Zack Langston and the Student-Athlete Class to suffer physical injury and damages in the form of, *inter alia*, past, ongoing, and future medical expenses, other out of pocket expenses, lost time, lost future earnings, and other damages, including death.

129.    As a result of its misconduct, Defendant NCAA is liable to Plaintiff Langston and the Student-Athlete Class for the full measure of damages and other relief allowed under applicable law, including under Kan. Stat. Ann. § 60-1801.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(*In the Alternative to Breach of Contract*)**
**(On Behalf of Plaintiff Langston and the Student-Athlete Class as Against Defendants)**

130.    Plaintiff Langston incorporates by reference the foregoing allegations, excluding paragraphs 105–129.

131.    Defendants receive significant revenues from the collegiate football played by student-athletes. These revenues include, but are not limited to, contractual revenues from broadcasting, merchandising agreements, and ticket sales.

132.    Defendants appreciate and have knowledge of such benefits. ☐

133.    Under principles of equity and good conscience, Defendants should not be ☐ permitted to retain the profits they received at the expense of Plaintiff Langston and the Student-Athlete Class while refusing to pay for medical expenses incurred as a result of their unlawful

misconduct or otherwise failing to prevent such injuries.

134.    Plaintiff Langston, individually and on behalf of the Student-Athlete Class, seeks restitution and/or disgorgement of all monies Defendants have unjustly received as a result of their misconduct alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and on behalf of the Classes, respectfully request that the Court enter an Order providing for the following relief:

A.    Certify this case as a class action on behalf of the Classes defined above, appoint Plaintiffs as Class Representatives, and appoint their counsel as Class Counsel;

B.    Declare that Defendants' actions, as set out above, constitute negligence, breach of contract, and unjust enrichment;

C.    Award all economic, monetary, actual, consequential, compensatory, and punitive damages caused by Defendants' conduct, including without limitation damages for past, present, and future medical expenses, other out of pocket expenses, lost time and interest, lost future earnings, and other damages;

D.    Award Plaintiffs and the Classes their reasonable litigation expenses and attorneys' fees;

E.    Award Plaintiffs and the Classes pre- and post-judgment interest, to the extent allowable;

F.    Enter injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiffs and the Classes; and

G.    Award such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiffs demand a trial by jury for all issues so triable and designates Kansas City,

Kansas as the location.

Respectfully submitted,

**CHARLES MARCUS LANGSTON**, as
Administrator of the Estate of Zack Langston,
**DANAE YOUNG**, as mother and next friend for
D.L., a minor, and all others similarly situated,

Dated: June 2, 2017

By: /s/
One of Plaintiffs' Attorneys

Glenn R. Gulick, Jr. (D. Kansas No. 70321)
glenn@4stateslaw.com
JOHNSON, VORHEES & MARTUCCI
510 West Sixth Street
Joplin, Missouri 64801
Tel: 417.206.0100
Fax: 417.206.0110

Jay Edelson*
jedelson@edelson.com
Benjamin H. Richman*
brichman@edelson.com
EDELSON PC
350 North LaSalle Street, 13th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Rafey S. Balabanian*
rbalabanian@edelson.com
EDELSON PC
123 Townsend Street
San Francisco, California 94107
Tel: 415.212.9300
Fax: 415.373.9435

Sol Weiss*
sweiss@anapolweiss.com
Larry Coben*
lcoben@anapolweiss.com

33

David Senoff*
dsenoff@anapolweiss.com
ANAPOL WEISS
One Logan Square
130 North 18th Street, Suite 1600
Philadelphia, Pennsylvania 19103
Tel: 215.735.2098
Fax: 215.875.7701

Jeff Raizner*
efile@raiznerlaw.com
RAIZNER SLANIA LLP
2402 Dunlavy Street
Houston, Texas 77006
Tel: 713.554.9099
Fax: 713.554.9098

*Counsel for Plaintiffs and the Putative Classes*

*\*Pro hac vice* admission to be sought.